IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

| | | |
|---|---|---|
| INNOVATIVE SOLUTIONS AND SUPPORT, INC., | ) ) ) | |
| Plaintiff, | ) | No. 05-2665-JPM/tmp |
| v. | ) ) | |
| | ) | UNDER SEAL |
| J2, INC., JOSEPH CAESAR, JAMES ZACHARY, ZACHARY TECHNOLOGIES, INC., and KOLLSMAN, INC., | ) ) ) ) | |
| Defendants. | ) | |

---

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION
FOR EXEMPLARY AND PUNITIVE DAMAGES**

---

Pending before the Court is Plaintiff Innovative Solutions and Support, Inc.'s ("ISS") Motion for Exemplary and Punitive Damages (Doc. 680), filed December 21, 2007. Defendants James Zachary and Zachary Technologies, Inc. (collectively, "ZTI"); Defendants J2, Inc. and Joseph Caesar (collectively, "J2"); and Defendant Kollsman, Inc. ("Kollsman") all filed their responses (Docs. 691, 693, & 697, respectively), on January 14, 2008. ISS filed a Reply (Doc. 729) in support of its motion on March 5, 2008. Kollsman filed a Sur-Reply (Doc. 732) on March 12, 2008. The Court held a hearing in this matter on March 14, 2008.[1] For the following reasons the Court GRANTS ISS's Motion for

---

[1] At the hearing, ISS withdrew the Motion for Exemplary and Punitive Damages as to the ZTI Defendants. Accordingly, the Court will only consider the motion as to Kollsman and J2.

Exemplary and Punitive Damages as to Kollsman and DENIES ISS's Motion for Exemplary and Punitive Damages as to J2.

**I. BACKGROUND**

On November 6, 2007, a jury found, inter alia, that ISS proved by a preponderance of the evidence that Kollsman, ZTI, and J2 misappropriated six of ISS's trade secrets: ISS's checksum source code; ISS's checksum algorithm; ISS's altitude rate algorithm; ISS's combined recipe incorporated in the ISS ADDU and AIU interface; ISS's RS 422 logical message protocol; and ISS's testing and calibration procedures relating to pressure transducer stability, i.e., the pressure transducer stability problem and how to solve the problem. (Jury Verdict Form (Doc. 660) 3-5.) The jury also found that ISS proved by a preponderance of the evidence that Joseph Caesar and ZTI breached their non-disclosure agreements; that Zachary Technologies, Inc. breached its 2002 contract with ISS; that J2 and ZTI unfairly competed with ISS; that Joseph Caesar breached his fiduciary duty under Tenn. Code Ann. § 48-18-403 to ISS; that ZTI and Joseph Caesar breached fiduciary duties or duties of loyalty to ISS; and that James Zachary is the alter ego of Zachary Technologies, Inc. (Id. at 6-8.) Finally, the jury found that ISS proved by clear and convincing evidence that Defendants' conduct in committing these common law and statutory

violations was intentional, reckless, malicious, or fraudulent. (Id. at 16-18.)

The jury found all the Defendants jointly and severally liable for $6,027,357 in damages caused by the misappropriation of the six trade secrets. (Id. at 8-9.) This amount included ZTI and J2's liability for breach of their contract obligations to ISS. (Id. at 10-11.) The jury awarded ISS $555,849 in damages as a result of J2 and ZTI's unfair competition. (Id. at 12.) Finally, the jury found Caesar and ZTI liable to ISS for $80,000 and $120,000, respectively, for breaches of fiduciary duties and duties of loyalty. (Id. at 14.) Now ISS seeks an award of $12,054,074 in exemplary damages against Kollsman and J2 under the Tennessee Uniform Trade Secrets Act ("TUTSA") § 47-25-1704(b) and an award of punitive damages against J2 under Tennessee common law.

**II. ANALYSIS**

TUTSA provides that if "willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made" for misappropriation. Tenn. Code Ann. § 47-25-1704(b). ISS urges the Court to award exemplary damages in light of the jury's finding of willful and malicious misappropriations, Kollsman's litigation strategy, and Kollsman's continued infringement. Kollsman argues that, notwithstanding the verdict, there is

insufficient evidence to support the jury's finding and no misconduct on which to base a decision to awards exemplary damages.  J2 argues that because of their financial situation, their willingness to enter into injunctive relief and to settle, the dearth of evidence of their misappropriation, and their lack of profit from the misappropriation, exemplary damages against them are unwarranted.

TUTSA directs courts to interpret and apply its provisions "to effectuate its general purpose to make consistent the law with respect to the subject of this act among states enacting it."  Tenn. Code Ann. § 47-25-1709 (2000); see also Hauck Mfg. Co. v. Astec Indus., Inc., 375 F. Supp. 2d 649, 654 (E.D. Tenn. 2004) (seeking guidance in interpreting and applying TUTSA from case law of other states that had adopted the Uniform Trade Secrets Act).  The Uniform Trade Secrets Act's comments describe its exemplary damages provision as following "federal patent law in leaving discretionary trebling to the judge even though there may be a jury."  UNIF. TRADE SECRETS ACT § 3, cmt. (amended 1985)(citing 35 U.S.C. § 284 (1976)).  When, as with TUTSA, the Tennessee legislature "enacts provisions of a uniform code or model act without significant alteration," the Court may assume that it shares "the expressed intention of the drafters of that uniform or model act."  In re Estate of Soard, 173 S.W.3d 22, 28 (Tenn. Ct. App. 2005).

Like courts in other Uniform Trade Secret Act jurisdictions, the Court will rely on federal patent law in determining whether to award exemplary damages. See, e.g., Biocore, Inc. v. Khosrowshahi, 2004 WL 303194, at *4 (D. Kan. Feb. 2, 2004); Zawels v. Edutronics, Inc., 520 N.W.2d 520 (Minn. Ct. App. 1994) (affirming the district court's application of patent law rather than state punitive damages law in awarding exemplary damages; but also affirming the district court's departure from patent law in awarding exemplary damages without an "explicit finding on this issue"); see also McFarland v. Brier, 769 A.2d 605, 612 (R.I. 2001) (holding that in enacting its version of the Uniform Trade Secrets Act, the "Legislature intended to relax this stringent common law standard to deal with the intentional and egregious misconduct"); but see O2 Micro Intern. Ltd. v. Monolithic Power Sys., Inc., 399 F. Supp. 2d 1064, 1079 (N.D. Cal. 2005) (reasoning that the Uniform Trade Secrets Act's comments "only state that, as in patent law, exemplary damages are for the judge, not jury, to determine. The comments do not state that patent decisions and standards apply to exemplary damages under the UTSA; nor do the comments support following patent law when there are California cases on point.").

The Court of Appeals for the Federal Circuit has provided district courts with several factors to consider when

determining whether damages should be enhanced. They include: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that the patent was invalid or not infringed; (3) the infringer's behavior as a party to the litigation; (4) defendant's size and financial condition; (5) closeness of the case; (6) duration of defendant's misconduct; (7) remedial action by the defendant; (8) defendant's motivation for harm; and (9) whether defendant attempted to conceal its misconduct. <u>Liquid Dynamics Corp. v. Vaughan Co., Inc.</u>, 449 F.3d 1209, 1225 (Fed. Cir. 2006); <u>Read Corp. v. Portec, Inc.</u>, 970 F.2d 816, 826-27 (Fed. Cir. 1992), <u>superseded on other grounds as recognized in</u> <u>Hoechst Celanese Corp. v. BP Chems. Ltd.</u>, 78 F.3d 1575, 1578 (Fed. Cir. 1996).

Inasmuch as a finding of willful infringement does not mandate enhancement of damages, the above factors taken together assist the Court in evaluating the degree of the infringer's culpability and in determining whether to exercise its discretion to award enhanced damages and how much the damages should be increased. See <u>Read</u>, 970 F.2d at 828. Use of these factors "is in line with punitive damage consideration in other tort contexts." <u>Id.</u> at 827-28 (comparing the enumerated factors to those set forth in <u>Hodges v. S.C. Toof & Co.</u>, 833 S.W.2d 896,

900-02 (Tenn. 1992)("the factfinder shall consider, to the extent relevant, at least the following: (1) The defendant's financial affairs, financial condition, and net worth; (2) The nature and reprehensibility of defendant's wrongdoing, for example (A) The impact of defendant's conduct on the plaintiff, or (B) The relationship of defendant to plaintiff; (3) The defendant's awareness of the amount of harm being caused and defendant's motivation in causing the harm; (4) The duration of defendant's misconduct and whether defendant attempted to conceal the conduct; (5) The expense plaintiff has borne in the attempt to recover the losses; (6) Whether defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior; (7) Whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act; (8) Whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and (9) Any other circumstances shown by the evidence that bear on determining the proper amount of the punitive award. The trier of fact shall be further instructed that the primary purpose of a punitive award is to deter misconduct . . . .")). Accordingly, the Court will apply the same analysis for determination of both punitive

damages under Tennessee common law and exemplary damages under TUTSA. Upon consideration of each of these factors, the Court finds it appropriate to enhance the jury's damages award in this case.

First the Court considers the Read and Hodges factors that point to the egregiousness of the misappropriation: deliberateness, motivation, duration of the misconduct, concealment, and good-faith investigation. Kollsman and J2 assert there is not clear and convincing evidence of willful or malicious misappropriation. ISS cites to several pieces of evidence on which the jury may have relied in reaching their verdict. Joseph Caesar, already involved in ISS's remote air data module ("RADM") development, concealed his name and involvement in J2, Inc. from ISS. (Trial Tr. 4144:13-21.) When Kollsman relied on former ISS engineers Steven Tomlinson and Frederick Strathmann to make its ADC software RVSM compliant, they understood they would use the RS 422 source code James Zachary had acquired. (Trial Ex. 191.) Caesar traveled at ISS's expense, during which time he secured installation contracts for Kollsman's infringing devices. (Trial Ex. 41, 42.) Kollsman made no investigation to determine why their ADCs communicated with ISS's. (Trial Tr. 550:9-20, 1255, 1259.) After Kollsman became aware of ISS's misappropriation suit against J2 and ZTI, they continued to sell infringing ADCs and

8

work with Caesar, Zachary, and Strathmann; they did not investigate their possible misappropriation; and they intervened in, and therefore increased the cost of, the litigation. (Trial Tr. 1552-53, 1555-57.) Internal emails revealed that Kollsman executives did not trust J2 with their own trade secrets. (See Trial Ex. 113 ("How much do we trust these guys? Are we going to sign an agreement with them? I do not feel comfortable giving them the source code for S/W that we paid for and own unless you believe that we are contractually obligated. (We may be the next ones suing them!!??).").) These facts indicate that Kollsman and J2's trade secret misappropriations were deliberate and that they continued without investigation. Accordingly, these factors support a heightened award of damages.

Next the Court considers those Read and Hodges factors that concern the Defendants' litigation conduct and the closeness of the questions they litigated. ISS, ZTI, and J2 consistently expressed an interest in resolving this case without trial, but Kollsman rebuffed these attempts at settlement. (See Doc. 680, Ex. 3; Doc. 691, at 6; Doc. 693, at 5.) At trial, as in his deposition, Kollsman's expert Michael DeWalt conceded that Kollsman's source code "highly correlated" to ISS's source code. (Trial Tr. 2885.) In their defense, Kollsman argued that Strathmann developed the source code in question and never assigned it to ISS (Trial Tr. 157), despite conflicting evidence

demonstrating that other ISS engineers developed the RS 422 message protocol. (Trial Tr. 1212-13, 1687-89; see also Trial Tr. 4848 (Court instructing the jury that "[w]ith respect to the checksum, there is no proof in the record that Mr. Fred Strathmann wrote that specific IS&S checksum").) At trial, ISS impeached Kollsman's executives. (Trial Tr. 2554-55, 2562-63, 2633-36, 3177.) Meanwhile, Kollsman failed to produce evidence of "design-around" products still containing ISS's source code that it began developing with Mr. Strathmann in March of 2007. (Doc. 680, Exs. 4-7.) There is also evidence indicating J2 destroyed relevant evidence rather than produce it. (Trial Tr. 484-85, 3766.) Kollsman argues that theirs was a close case because the jury did not find in favor of ISS on every alleged count of misappropriation, only on six such counts. It was not, however, a close case as to those six counts. Kollsman's expert conceded as much when he described Kollsman's source code as being "highly correlated" with ISS's, and the Court instructed the jury to disregard Kollsman's primary defense because there was no evidence to support it. (Trial Tr. 2885; Trial Tr. 4848.) Accordingly, the litigation-related factors also support a heightened award of damages.

Both Read and Hodges include the defendants' financial condition among the factors to consider in deciding whether or not to award exemplary damages. See Read, 970 F.2d at 827;

Hodges, 833 S.W.2d at 901. J2's financial condition is not in dispute. (See Pl.'s Mot. (Doc. 680), at 12 ("As to the J2 Defendants, their reported resources seem to be meager. J2 claims to have $2,000 in assets as of the most recent quarter.") (citing J2 Balance sheet (Doc 680, Ex. 15)).) With only two thousand dollars in assets, J2 will not be able to satisfy the jury's damages awards against them, much less heightened damages. Accordingly, the Court DENIES Plaintiff's Motion for Exemplary Damages as to J2.

Unlike J2, Kollsman has ample assets to satisfy the jury verdict against them. Kollsman's financial records assess the company's annual sales at more than forty-four million dollars, shareholders' equity at more than sixty-four million dollars, and total assets at nearly one hundred forty million dollars. (Doc. 680, Ex. 14.) In addition, Kollsman has relied upon the financial health of its parent company Elbit Systems, Ltd. in opposing a temporary injunction during this litigation (see Kollsman's Opp. to Mot. for Prelim. Inj. (Doc. 151), at 21 ("[T]he revenues of Kollsman's worldwide parent company Elbit System, Ltd., increased by 13.8% in 2005 to $1.07 billion.")), and is, therefore, judicially estopped from arguing those resources are not also relevant to their financial condition for purposes of determining heightened damages. See Cont'l Trend Res., Inc. v. Oxy USA, Inc., 810 F. Supp. 1520, 1533 (W.D. Okla.

1992), aff'd 101 F.3d 634 (10th Cir. 1996); New Hampshire v. Maine, 532 U.S. 742, 750 (2001). Accordingly, the financial condition factor supports an award of heightened damages.

Finally, both Read and Hodges consider what remedial actions a defendant takes in response to learning of the misappropriation. See Read, 970 F.2d at 827; Hodges, 833 S.W.2d at 902. As discussed above, Kollsman did not investigate the allegations of misappropriation when they first came to light. In addition to continuing to produce and sell misappropriated technology, Kollsman recently began developing "derivative" products, using both the misappropriated trade secrets and one of the engineers partially responsible for their misappropriation, Mr. Strathmann. (Doc. 680, Ex. 4-7.) Finally, Kollsman disingenuously refused to perform any repairs on previously installed ADCs despite clear prior authorization to do so. All the factors the Court has considered weigh in favor of assessing heightened damages against Kollsman.

In conclusion, the Court finds heightened damages are appropriate in this case. Accordingly, the Court GRANTS ISS's Motion for Exemplary and Punitive Damages as to Kollsman and AWARDS ISS an additional $12,054,074, pursuant to Tenn. Code Ann. § 47-25-1704(b).

**III. CONCLUSION**

For the reasons discussed above, the Court GRANTS IN PART AND DENIES IN PART Plaintiff's Motion for Exemplary and Punitive Damages. The Court DENIES the motion as to J2, GRANTS the motion as to Kollsman, and AWARDS ISS an additional $12,054,074, pursuant to Tenn. Code Ann. § 47-25-1704(b).

So ORDERED this 30th day of June, 2008.

                              s/ JON PHIPPS McCALLA
                              UNITED STATES DISTRICT JUDGE